**Frank M. BERLIN,**
**Plaintiff–Appellant (87–1475),**

Norbert A. Ogden, Milton A. Hartman, James K. Husk, M. Jean Kazlauskaus, Theodore J. Reuther, Charles G. Cook, William Reno, Oscar L. Cox, Henry Harrower, David R. Henderson, Shirley A. Hunt, Geraldine Rivard, Fred Schmekel, John Dunstone, Theresa Orjada, Chester Schuster, Kenneth Young, Roman S. Grucz, Andrew Lutenski, Herman Stuedemann, Robert Barnes, George Cappell, Ralph J. Banner, Alena Higgins, and Carolyn P. Thiede, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants (87–1478),

v.

**MICHIGAN BELL TELEPHONE COMPANY, a Michigan Corporation, and Dan Grady, Defendants–Appellees.**

Nos. 87–1475, 87–1478.

United States Court of Appeals, Sixth Circuit.

Argued July 25, 1988.

Decided Oct. 3, 1988.

Bradley A. Carl, W. Merritt Jones, Jr., Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., Robert B. Stevenson (argued), Law Offices of Robert B. Stevenson, Ann Arbor, Mich., Francis M. Fitzgerald, Barbier, Petersmarck, Tolleson, Mead, Paige & Carlin, P.C., Mt. Clemens, Mich., John F. O'Grady, Saginaw, Mich., Theresa Smith Lloyd, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Mark R. Ulicny, Detroit, Mich., for plaintiffs-appellants.

Robert Vercruysse, Gloria A. Hage, Constance Ettinger (argued), Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for defendants-appellees.

Before LIVELY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

MILBURN, Circuit Judge.

Plaintiffs-appellants in No. 87–1478, a class action, appeal the judgment of the district court granting the motion of defendants-appellees Michigan Bell Telephone ("MBT") and Dan Grady, Vice President–Personnel at MBT, for summary judgment on plaintiffs' claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff-appellant in No. 87–1475, Frank M. Berlin, appeals the summary judgment of the district court entered in favor of MBT and Grady on Berlin's claims under ERISA. As the issues to be decided are identical with one exception (an additional issue in Berlin's case), these appeals have been con-

solidated. Because we find that genuine issues of material fact exist as to when a fiduciary duty arose under ERISA, 29 U.S.C. § 1104, and we also find that genuine issues of material fact exist as to whether or not there was a breach of a fiduciary duty, we reverse the summary judgments of the district court.

## I.

### A.

*No. 87–1478*

Plaintiffs in No. 87–1478 commenced their action on February 9, 1983, by filing a class action complaint on behalf of the representative plaintiffs and all other former MBT employees who retired between December 1, 1980, and June 1, 1982, and who would have been eligible for benefits under a special MBT severance plan called the Management Income Protection Plan ("MIPP") had they retired between June 1, 1982, and July 31, 1982. Among other things, plaintiffs allege that they were wrongfully denied retirement benefits in violation of ERISA, 29 U.S.C. § 1001 *et seq.*

The class plaintiffs are former MBT employees who were not offered severance benefits pursuant to MBT's MIPP severance plan upon their retirement. Plaintiffs initially asserted claims under state law as well as under ERISA; however, plaintiffs' state law claims were dismissed by the district court. *See Ogden v. Michigan Bell Tel. Co.,* 595 F.Supp. 961 (E.D.Mich.1984); 571 F.Supp. 520 (E.D.Mich.1983). The dismissal of the state law claims is not before us on appeal.

After extensive discovery and after plaintiffs amended their complaint three times, defendants on February 27, 1986, moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Likewise, on the same day, plaintiffs also moved under Rule 56 for summary judgment on their third amended complaint.

After corresponding briefs were filed, the district court on January 27, 1987, issued its memorandum opinion and order granting defendants' motion for summary judgment and denying plaintiffs' motion.

On March 31, 1987, the district court issued a superseding memorandum opinion and order withdrawing a portion of its January 27, 1987, opinion but granting defendants' motion and dismissing plaintiffs' entire action with prejudice. *Ogden v. Michigan Bell Tel. Co.,* 657 F.Supp. 328 (E.D.Mich. 1987). The district court then entered final judgment the same day in No. 87–1478 in favor of defendants, pursuant to Federal Rule of Civil Procedure 58. The plaintiffs' timely appeal followed.

### B.

*No. 87–1475*

In No. 87–1475, plaintiff Frank Berlin commenced his action by filing a complaint on March 2, 1983, alleging that he retired from MBT after December 1, 1980, but before June 1, 1982, and that he would have been eligible for severance benefits under MIPP had he retired between June 1, 1982, and July 31, 1982. The essential difference between the position of plaintiff Berlin and the class plaintiffs is that Berlin alleges that he initially notified MBT that he would retire effective June 7, 1982, which would have enabled him to elect MIPP severance benefits. However, he was urged by a district manager for MBT to change his effective retirement date to May 31, 1982, for administrative accounting convenience. Berlin agreed and retired effective May 31, 1982, which placed him one day outside the MIPP offering in question.

On April 20, 1987, the district court granted defendants' motion for summary judgment against Berlin, relying on the reasoning articulated in the court's March 31, 1987, opinion in No. 87–1478. Plaintiff Berlin's timely appeal followed.

### C.

*Common Factual Allegations*

During the time period relevant to this appeal (October 1980 through July 1982), MBT was experiencing financial difficulties, and there was a growing realization at MBT that there existed an overabundance

of management-level employees within the company. As a result, MBT officials began to consider options for reducing surplus management, ruling out, however, layoffs which were contrary to the company's basic philosophy. In response to the management surplus problem, MBT officially adopted MIPP on October 1, 1980, as a tool to downsize management. MIPP operated as an incentive package to encourage voluntary terminations or early retirement for individuals affected by what the company denoted as a "resizing opportunity," thereby accelerating the attrition rate among management-level employees.

The availability of the first MIPP offering was from October 1, 1980, through December 1, 1980 (the first MIPP window period or offering). A second MIPP offering covering the period of June 1, 1982, through July 31, 1982 (the second MIPP window period), is what gives rise to the issues in controversy in the present cases.

MIPP operated as an unfunded welfare benefit plan, meaning that no trust corpus existed. *See* 29 U.S.C. § 1002(1). As an employee welfare benefit plan, MIPP was subject to ERISA. *See* 29 U.S.C. § 1101(a). Those persons found eligible for MIPP benefits generally could receive, in addition to any pension or other unrelated benefit, a separation pay allowance of 5 per cent annual salary plus 5 per cent for each completed year of net credited service in excess of one year of net credited service (with a maximum of 100 per cent of annual salary) to be paid over a one-year period beginning at retirement. MIPP also provided additional medical insurance coverage. The funds necessary to meet the costs of a MIPP extension were paid directly by MBT based on the actual cost of MIPP.

Both parties concede that MIPP was adopted as a force reduction tool and used by MBT to encourage voluntary terminations or early retirement. J.A. at 865. An offer of MIPP benefits could only occur when the fiduciary named for the MIPP program designated an employee or group of employees as "affected by a resizing opportunity." J.A. at 32. The plan provided that "[t]he Vice President–Personnel shall be the named fiduciary of the Plan." J.A. at 36.[1] Moreover, the plan states that the decision to implement the plan is to be made by the vice president-personnel. *Id.* At all relevant times, defendant Grady was the Vice President–Personnel at MBT and the admitted fiduciary under the MIPP plan. MBT, through its agent, Grady, is named as plan administrator. J.A. at 47.

The events giving rise to the present cases occurred between October 1, 1980, when MIPP was first implemented, and July 31, 1982, when it became apparent that the plaintiffs in the present cases would be ineligible for MIPP benefits because they retired after the close of the first MIPP window but before the opening of the second. The district court found that MIPP remained effective during the period from October 1, 1980, through July 31, 1982, since (although not always implemented) MIPP was always a viable work force reduction alternative available to the company.

MIPP could be used by MBT in various ways. For example, MIPP benefits might be offered to a specific individual to encourage that individual's retirement. MIPP also could be applied generally to management-level employees in a certain category. According to a news publication for management personnel at MBT ("News for Management Bulletin" or "NMB"[2]):

> MIPP was used in Michigan to correct a surplus situation that was not correctable simply by attrition or routine personnel handling. MIPP, under its guidelines, cannot be used to eliminate weak or unsatisfactory performers.

. . . . .

---

1. Under ERISA, employee benefit plans must be established and maintained pursuant to a written agreement which must designate a named fiduciary. 29 U.S.C. § 1102(a).

2. MBT used NMBs to communicate with managers regarding relevant developments at MBT. NMBs were not prepared by Vice President–Personnel Grady; however, he testified that he could review the publication prior to distribution and correct any errors. J.A. at 900.

MIPP is used only when there is a surplus condition resulting from three specific situation [sic] (1) a general reduction of management jobs; (2) elimination of specific management jobs; (3) significant changes in specific management jobs; for example, skills and abilities.

J.A. at 867.

As stated earlier, the first general MIPP offering or window period was established from October 1, 1980, to December 1, 1980. Managers designated as eligible for MIPP benefits on the basis of their "net credited service" who retired during the window period could receive MIPP benefits. Of the managers offered MIPP, approximately one hundred voluntarily terminated their employment at MBT within the window period and were given MIPP benefits. J.A. at 52, 869.

Following this first general MIPP offering, there was, as might be expected, considerable interest among potentially affected managers, especially those considering retirement, about the possibility of future general MIPP offerings. As a result of this concern, and because it appeared to MBT officials that some MBT managers were delaying retirement decisions in the hopes of a future MIPP offering, MBT officials made several communications (alleged by plaintiffs to be misrepresentations) regarding the future possibility of a MIPP extension. Plaintiffs' contention in the present cases is that MBT intentionally misled plaintiffs by indicating that the late–1980 MIPP offering had been a one-time application, that MIPP benefits would not again be made available, and that managers considering retirement should not delay plans in anticipation of another MIPP offering.

The communications involved in the present cases began during the time the first general MIPP offering was in effect. On November 3, 1980, a News for Management Bulletin was circulated among management which quoted defendant Grady as having made the following statement:

All the managers who are going to be offered MIPP have now been given the opportunity to accept it.... In this

phase of the company's downsizing, no additional offers of MIPP will be made.

I can't say that MIPP won't be offered again at some time in the future when circumstances require it. But for now, we have taken care of the [management] surplus problem that existed and we won't be making any additional offers of MIPP.

I'm sure the general awareness that MIPP was being offered even on a very limited basis may have caused some managers to delay their plans to retire. If any of them are still waiting in anticipation of receiving such an offer, there's no reason for them to delay any longer....

J.A. at 865–66.

On November 14, 1980, another NMB was circulated which quoted defendant Grady as seeing "no future use of MIPP on a general basis." J.A. at 868. The flyer continued:

[H]e [i.e. Grady] believes there could be infrequent and very specific uses, for example an office closing or an operation dramatically reduced by new technology. The Michigan experience indicates that MIPP gave the company a new way to deal effectively—and humanely—with management surplus.

Id.

Another NMB flyer, dated March 26, 1981, also touched upon the possibility of future MIPP offerings. This bulletin again reiterated the company's position that employees considering retirement should not delay decisions based upon the possibility of a second MIPP offering:

At MBT, as stated last November by Personnel Vice President Dan Grady, for the foreseeable future, general use of MIPP in Michigan is at an end.

Any use of the plan in the foreseeable future is likely to be quite rare and on a very limited basis, said Dick Christie, assistant vice president-human resources development.

J.A. at 869. After circulation of the March 26, 1981, NMB flyer, subsequent NMBs never mentioned the MIPP plan until the second general MIPP offering was announced in June 1982. J.A. at 199–200.

In addition to NMBs, throughout the relevant time period involved in these cases, a number of officers and high-level managers at MBT, including Grady, spoke to different groups regarding personnel matters, including retirement, and made various statements about the possibility of future MIPP offerings.[3] These managers stated that questions regarding MIPP invariably arose during personnel sessions with managers.

As indicated, Grady regularly spoke to managers about personnel matters. Grady testified that he was often asked at these sessions about the likelihood of a general MIPP offering. J.A. at 897. Grady testified that he typically responded to these questions by saying:

> That we had applied MIPP in 1980 based on the surplus at that time, and we considered using the macromeasures for the corporation, that at that time we did not have a condition beyond which attrition would manage and we didn't anticipate because of that applying [MIPP] in a general way.

J.A. at 898. Martha Thornton, an MBT employee, testified at her deposition that she had witnessed Grady field questions concerning MIPP on various occasions, and that Grady consistently responded with "[c]omments to the extent that there were no current plans to offer MIPP." J.A. at 932.

Roy Leet, a district manager in MBT's Benefits Office, also spoke to a significant number of MBT managers about personnel matters. Leet gave a number of retirement seminars between October 1981 and May 1982, at which he discussed various aspects of retirement. Leet testified that although his expertise involved traditional retirement benefits, he was nonetheless asked at most, if not all, of his seminars about the likelihood of a second MIPP offering. Leet stated that his stock answer to these questions was that MBT had "no plans for a MIPP ..." J.A. at 928. However, Leet stated that he also cautioned

employees that if they became aware of facts which would warrant a MIPP offering (such as substantial management surplus combined with financial shortcomings), they should make their own determination about whether MIPP would be offered or not. J.A. at 928.

William Schlageter, Vice President of Transition and Support Services at MBT, also spoke to various managers about MIPP and was regularly asked about the possibility of a general MIPP offering. He testified that on advice from Grady, he responded to these questions that "a general MIPP application was unlikely and that those who were ready to retire should go ahead and retire." J.A. at 907. Schlageter stated that the tenor of his responses to questions about MIPP did not change until the decision to offer MIPP again in June 1982. Roman Grucz, an MBT employee, indicated that he was present at a May 18, 1982, meeting in which Schlageter answered a question about MBT by stating that there would be no MIPP benefits available in the future. J.A. at 169.

As stated earlier, the second general MIPP offering was extended to certain managers retiring between June 1, 1982, and July 31, 1982. It is undisputed that the actual decision to offer MIPP a second time was made at a June 11, 1982, MBT executive group meeting. J.A. at 939. Furthermore, it is undisputed that prior to the formal decision to extend a second MIPP offering, MBT was consistently concerned about management surplus. Defendants concede that during the relevant period (October 1980 through June 11, 1982), high-level MBT officials periodically discussed a MIPP implementation as a mode for addressing the surplus problem. Since MIPP was a relatively costly alternative for reducing surplus, its use was consistently rejected by MBT officials. The parties further agree that no quantifiable implementation criteria existed for MIPP. MIPP was an option to be used in the company officials' discretion, but there was

---

3. Apparently a number of these presentations, including some conducted by Grady, were made over closed-circuit television and videotaped or were themselves video presentations. J.A. at 912, 917. MBT, however, has been unable to locate the videotapes.

no requirement that it be used if specified conditions were found to exist.

Considering, however, the traditional ban against management layoffs at MBT, combined with the natural reluctance to extend MIPP benefits except as a last resort, MBT officials had at their disposal only a limited number of options for reducing management surplus. MBT officials were also finding that one problem in normal management attrition through retirement was a direct result of the first general MIPP offering in 1980. Employees considering voluntary termination after the first offering seemingly withheld or delayed termination decisions in the hopes that MIPP would be implemented again. This problem was discussed by MBT officials, and the decision was reached that the problem should be dealt with merely by informing employees that no definite plans to extend MIPP existed and, therefore, that employees considering retirement should not delay their decisions. Schlageter testified that after consultation with Grady, a decision was reached by them that managers could be encouraged to retire by indicating to them that there were no current plans for a second MIPP offering. J.A. at 913–14.

The parties also agree that it is difficult to determine when MBT concluded that only a second MIPP offering would adequately alleviate the management surplus problem. However, the record discloses that management surplus was discussed throughout the relevant period and that methods were discussed for work force reduction. MIPP was discussed in a number of meetings by MBT officials, and consideration of MIPP by high-level managers commenced as early as March 1982. Written cost-effectiveness studies were also undertaken, one of which was prepared on May 6, 1982, and another was prepared on May 20, 1982.

On June 1, 1982, a meeting was held at MBT to further design and discuss a MIPP offering. Although Grady briefly attended, the major participants at this meeting were high-level MBT managers, and a recommendation was made that MIPP should be offered again. Grady then secured the approval of MBT's chief operating officer and president before presenting a recommendation to MBT's executive group that MIPP should be offered. As stated, the recommendation was subsequently approved at a meeting on June 11, 1982.

Prior to the formal decision to extend the second MIPP offering, there was concern among high-level MBT management that some managers who had retired prior to the second MIPP offering (but after the first) would feel that they had been unfairly denied MIPP benefits. Accordingly, some officials suggested that the second offer be made retroactive to the first broad MIPP offering. However, it was determined that the MIPP offering should only be made effective for those retiring on or after June 1, 1982, and that any fairness concerns had been adequately addressed in MBT's communications about MIPP.

The pivotal allegation made by the plaintiffs in the present cases is that defendants, when making statements during the period from December 1, 1980, to June 1, 1982, either knowingly or negligently made material misrepresentations regarding the future availability of MIPP benefits with the intent to induce plaintiffs to act upon the alleged misrepresentations by voluntarily retiring at MBT and that in doing so, defendants breached their ERISA-imposed fiduciary duties.[4] The district court, however, held that no fiduciary responsibilities applied to defendants' conduct prior to the decision to offer MIPP benefits for a second period of time.

The district court noted that "[b]efore the court can determine whether a fiduciary violated his duties, the court must determine if he was acting as a fiduciary when he engaged in the disputed conduct." *Ogden*, 657 F.Supp. at 333. The district court stated that named ERISA welfare plan fiduciaries may also serve as corpo-

---

4. In their Third Amended Complaint, plaintiffs in No. 87–1478 also raised a claim for benefits under MIPP, alleging that defendants orally amended MIPP to apply to individuals in the class. J.A. at 136. Berlin, in No. 87–1475, raised an identical claim in his complaint. J.A. at 1135. As the appellants have not raised this issue before this court, we deem it abandoned.

rate officers, thus wearing "two hats." *Id.* (citing 29 U.S.C. § 1108(c)(3) (ERISA does not prohibit an individual from "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.")). Moreover, the district court held that where a corporate officer or an employer functions in dual roles, ERISA fiduciary duties apply only to those functions which are fiduciary in nature. When an employer or officer is "conducting business not regulated by ERISA," no fiduciary duties apply. *Id.* (citing *Amato v. Western Union Int'l Inc.*, 773 F.2d 1402, 1426–27 (2d Cir.), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986)).

The district court then considered "the nature of the June, 1982 decision by the defendants" to offer MIPP benefits. *Id.* at 334. If the decision to offer MIPP was a business decision, the district court explained, no ERISA fiduciary duties applied. In analyzing this issue, the district court adopted as a test whether a neutral third party could have made the decision to offer MIPP benefits. Concluding that a neutral third party could not have made such a decision, the court held that the decision to offer MIPP "was a business decision not undertaken in a fiduciary capacity." *Id.* at 335.

Plaintiffs, however, have consistently conceded that the decision to offer MIPP was a nonfiduciary business decision. Rather, plaintiffs argue that a distinction should be drawn between the actual corporate decision to offer benefits and communications made by fiduciaries to potential plan participants about the likelihood of a second implementation or offering of an existing welfare plan. The district court rejected this assertion, finding that "[i]t would be illogical to hold that even though the ultimate decision to offer MIPP was a business decision, that representations about that eventuality were made in a fiduciary capacity." *Id.* Given its conclusion that defendants had no duties under ERISA, the district court never reached the issue of whether any misrepresentations actually occurred in the present case.[5]

## II.

### A.

As the present cases were decided by the district court on cross-motions for summary judgment, we apply the same test as that used by the district court in reviewing a motion for summary judgment. *Hand v. Cent. Transp., Inc.*, 779 F.2d 8, 10 (6th Cir.1985). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions, and affidavits do not raise a genuine issue of material fact for trial. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

When presented with a summary judgment motion, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also Gutierrez v. Lynch,* 826 F.2d 1534 (6th Cir.1987). On summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not be counted."

---

5. The district court also addressed the standing of these plaintiffs to challenge defendants' conduct in the present case. *Ogden,* 651 F.Supp. at 331–33. The court concluded that as plaintiffs would participate in MIPP if successful in their action, they have standing to bring a claim for benefits. *Id.* at 332. Although the parties do not contest the district court's standing conclusion, we note that we may raise this issue *sua sponte, see, e.g., Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), but affirm the court's judgment in this regard for the reasons stated in its Memorandum Opinion and Order entered on March 31, 1987.

*Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The court must turn to the substantive law in determining which facts are material. *Id.*

### B.

We begin our analysis with a review of the fiduciary duties imposed under ERISA. We also are mindful of the admonition that "courts must always bear in mind the ultimate consideration whether allowance or disallowance of particular relief would best effectuate the underlying purposes of ERISA—enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 158, 105 S.Ct. 3085, 3098, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring). *See also* H.R. Conf.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5038, 5083 (Congress expects courts will interpret the fiduciary standards "bearing in mind the special nature and purpose of employee benefit plans.").

ERISA provides that plan fiduciaries have certain obligations to participants in the plan. Specifically, 29 U.S.C. § 1104(a)(1), which governs fiduciary duties, provides in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

The above fiduciary requirements imposed under ERISA have been delineated as having three components. *See Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). The first is referred to as the "duty of loyalty," and is codified in the requirement that "each fiduciary of a plan must act solely in the interests of the plan's participants and beneficiaries...." H.R.Conf.Rep. No. 1280, *supra,* at 5083. Pursuant to a fiduciary's duty of loyalty, all decisions regarding an ERISA plan "must be made with an eye single to the interests of the participants and beneficiaries." *Bierwirth,* 680 F.2d at 271.

The second obligation imposed under ERISA is known as the "prudent man" fiduciary obligation. This stems from the language quoted above requiring a plan fiduciary to act with the care, skill, prudence, and diligence that a prudent man acting in a like capacity would use in conducting an enterprise of like character. The prudent man standard, combined with the duty of loyalty

> imposes an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation. These familiar principles evolved from the common law of trusts that Congress codified and made applicable to ERISA trustees.

*Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984). Finally, an ERISA fiduciary must act "for the exclusive purpose" of providing benefits to plan beneficiaries. *Bierwirth,* 680 F.2d at 271.

■ As stated earlier, the district court never discussed the defendants' conduct in the present case in light of the above standards, given its holding that the decision to offer MIPP benefits for a second period of time was a business decision and, therefore, communications or representations relating to that decision were nonfiduciary.[6]

---

6. The parties have brought to our attention a recent decision of this court, *Hughes v. General*

*Motors Corp.,* 852 F.2d 568 (6th Cir.1988), in which we held we were without jurisdiction

Under ERISA, purely business decisions by an ERISA employer are not governed by section 1104's fiduciary standards. *See Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir.1988) (" 'ERISA ... envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets.' ") (quoting *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986)); *Trenton v. Scott Paper Co.*, 832 F.2d 806, 809 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); *Amato v. Western Union Int'l*, 773 F.2d 1402, 1416–17 (2d Cir. 1985) (ERISA employers may wear two hats and assume fiduciary status only when functioning in their capacity as plan administrators, not when conducting business), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986); *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 567 F.Supp. 1184 (N.D.W.Va.), *aff'd*, 724 F.2d 406 (4th Cir.1983), *cert. denied*, 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (same). *See also* Shawe & Swerdlin, *You Promised!—May an Employer Cancel or Modify Employee Severance Pay Arrangements?*, 44 Md.L.Rev. 903 (1985) (discussing *Sutton, supra* ).

 Under the exclusion from fiduciary standards for business decisions, corporate actions by plan administrators seeking to reduce the amount of unaccrued plan benefits, *West v. Greyhound Corp.*, 813 F.2d 951, 955–56 (9th Cir.1987), terminating a pension plan, *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1432 (9th Cir.1986), and deciding whether or not to establish a plan, *Moore v. Reynolds Metals Co.*, 740 F.2d 454, 456 (6th Cir.1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985), have all been found nonfiduciary.

Several courts have, however, held that misleading communications to plan partici-pants regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for breach of fiduciary duty. *Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc.*, 828 F.2d 710, 713 (11th Cir.1987); *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir.1983) ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in [29 U.S.C. § 1104]."); *Muenchow v. Parker Pen Co.*, 615 F.Supp. 1405, 1417 (W.D.Wis.1985) ("ERISA supplies a remedy for the wrong [of misrepresentation by fiduciaries] alleged in [plaintiff's] complaint."); *see also Rosen v. Hotel & Restaurant Employees & Bartenders Union of Philadelphia*, 637 F.2d 592, 600 n. 11 (3d Cir.1981) (holding a fiduciary is under a duty to communicate material facts to a plan beneficiary), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *District 65, UAW v. Harper & Row Publishers, Inc.*, 576 F.Supp. 1468, 1480 (S.D.N.Y.1983). Although these cases deal primarily with misrepresentations concerning the terms of an ERISA plan, their supporting rationale applies with equal force to this case—a fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. § 1104 are owed.

Thus, while the parties do not dispute the district court's holding that the decision to offer MIPP benefits was a nonfiduciary business decision, we do not agree with the district court's conclusion that it logically follows that any communications or representations made prior to such a decision were also nonfiduciary. On the contrary, we hold that when serious consideration was given by MBT to implementing MIPP by making a second offering (a question of material fact), then MBT as the plan administrator and/or its Vice President of Personnel Grady, the plan fiduciary, had a

---

under the terms of either 29 U.S.C. § 1132(e)(1) or 28 U.S.C. § 1331 to hear a claim for benefits under an early retirement benefits program under circumstances similar to those present in this case. In *Hughes*, however, no severance benefit plan was in effect at the time plaintiffs terminated their employment—it was rumored the employer might implement such a plan but none was in effect. Here, MBT adopted MIPP in 1980, and the plan was in effect and used, albeit sporadically, throughout the relevant period.

**1164**

fiduciary duty not to make misrepresentations, either negligently or intentionally, to potential plan participants concerning the second offering. Accordingly, any misrepresentations made to the potential plan participants after serious consideration was given to a second offering could constitute a breach of a fiduciary duty. Therefore, since genuine issues of material fact exist as to (1) when serious consideration of the second offering took place, and (2) whether or not any material misrepresentations were made to potential plan participants concerning the second offering, summary judgment was not proper.

It is also important to note what our decision does not hold. Defendants argue that plaintiffs seek to impose upon them a "duty of clairvoyance;" i.e., to predict accurately the future availability of MIPP benefits. Such a duty, however, would be inequitable, and, thus, we find that liability will lie only if material misrepresentations in violation of 29 U.S.C. § 1104 are proven by the plaintiffs.[7] This question, however, given the posture of these cases, is not presently before us but, rather, is for the district court on remand. *See Pullman–Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982).

We also note that plaintiffs are not arguing, nor do we hold, that defendants had any duties, under the circumstances of these cases, to say anything at all or to communicate with potential plan participants about the future availability of MIPP. However, we point out that in the case of an unfunded plan, as in the present cases, there can be no misrepresentations about a future offering until that point in time (a question of material fact) when serious consideration has been given by the plan administrator and/or plan fiduciary concerning the implementation of the plan. But if the plan administrator and/or plan fiduciary does communicate with potential plan participants *after serious consideration* has been given concerning a future implementation or offering under the plan, then any material misrepresentations may constitute a breach of their fiduciary duties.

## C.

■ On appeal plaintiffs have also raised a claim under ERISA's anti-interference clause, 29 U.S.C. § 1140, which generally prohibits discrimination against individuals for purposes of interfering with the attainment of ERISA benefits. Plaintiffs, however, did not raise section 1104 in their complaint and, indeed, when requested to brief the issue by the district court, took the position that "[section 1140] does not apply to voluntary terminations." J.A. at 1087. Because the issue was therefore not addressed in the district court, we find that it would be improper for this court to pass upon it. *See Bannert v. American Can Company,* 525 F.2d 104, 111 (6th Cir.1975), *cert. denied,* 426 U.S. 942, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

## D.

Finally, we note that plaintiff Berlin has an additional claim in that he was directly requested for accounting purposes to change his effective retirement date from June 7, 1982, to May 31, 1982, and, upon doing so, was ineligible for the MIPP offering available from June 1, 1982, through July 31, 1982. Berlin testified that he was told that "accounting" wanted him to make the date change. However, on the state of the present record, we are unable to determine whether Berlin was materially misled in violation of ERISA's fiduciary duties. Accordingly, this issue in Berlin's action is also remanded to the district court.

---

**7.** Defendants maintain that no misrepresentations could have occurred prior to a final decision to offer MIPP benefits as any pre-decision communications can be nothing more than predictions. We, however, find that this distinction goes to materiality rather than to the definition of "misrepresentation." If, for example, defendant Grady, after *serious consideration* of a sec-ond MIPP offering began, represented that MIPP was not being considered or used words to this effect, such a representation would be characterized as a material misrepresentation, although no final decision had been made. Materiality, of course, should be determined with reference to the effect of the statement upon the listeners.

## III.

For the reasons stated, the summary judgments of the district court are REVERSED, and these appeals are REMANDED for further proceedings consistent with this opinion.