John A. McAULEY; Theodore A. Griggs; Franklyn R. Lefevre, Sr.; Gerald L. Greenlief, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, INC., et al., Defendants–Appellees.

No. 97–6091.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 22, 1998.

Decided Jan. 22, 1999.

---

**1040**

G. Kennedy Hall, Jr. (argued and briefed), Kenneth S. Handmaker (briefed), Nancy T. Schook (briefed), Middleton & Reutlinger, Louisville, KY, Ronald E. Meisburg (briefed), Heenan, Althen & Roles, Washington, DC, for Plaintiffs–Appellants.

Charles E. Shivel, Jr., Stoll, Keenon & Park, Lexington, KY, Michael S. Horne (argued and briefed), Rebecca S. Campbell (briefed), Covington & Burling, Washington, DC, for Defendants–Appellees.

Before: MERRITT, JONES, and SILER, Circuit Judges.

## OPINION

SILER, Circuit Judge.

Plaintiffs are a class of retired employees from defendant International Business Machines ("IBM") Corporation's Lexington, Kentucky plant who retired during a downsizing period under a retirement plan somewhat less favorable than one offered soon after their effective retirement dates. They claim that IBM intentionally withheld information regarding a pending change in retirement options which would have been more favorable for employees in their situation in violation of IBM's fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") (codified at 29 U.S.C. § 1001, *et seq.*). More specifically, they complain that IBM used material misrepresentations and deliberate nondisclosure to fraudulently induce its retirement eligible employees to opt for a retirement date before December 31, 1990, rather than utilizing a leave of absence option to set a later retirement date, which would have made them eligible for an enhanced retirement plan offered in January 1991. The district court found that the employees retired before the date on which IBM had any duty to disclose the upcoming change in retirement plans and therefore granted summary judgment to IBM. Plaintiffs appeal the grant of summary judgment and the restriction of the class to former employees from the Lexington plant only, rather than similarly situated former employees nationwide. We REVERSE the grant of summary judgment as to a portion of the plaintiff class and AFFIRM the class certification.

## I.

In 1989 and 1990, IBM offered a series of early retirement incentive programs to its employees in order to reduce its workforce nationwide and at its Lexington plant in particular. The two programs relevant to this case are known as the Voluntary Transition Payment Program ("VTP") and the Lexington Transition Payment Program ("LTPP"). The VTP was initially offered to employees nationwide on December 5, 1989. Those electing to participate had to resign or retire by March 30, 1990 (Field Administration employees had a deadline of December 31, 1990.). On January 17, 1990, a variation of the VTP was offered which provided for up to five years of pre-retirement leave of absence ("VTP/LOA"). The VTP/LOA plan required that participants begin their leaves of absence no later than March 31, 1990. Upon their effective retirement date, participants would be entitled to receive benefits calculated in accordance with the IBM Retirement Plan as it existed on their retirement date. The LTPP was announced on August 1, 1990, and participants had to resign or retire by December 31, 1990. The LTPP also had a pre-retirement leave of absence feature which worked in the same way as the VTP/LOA. Plaintiffs retired either on or before December 31, 1990, and their retirement benefits are being calculated in accordance

with the IBM Retirement Plan in existence on their retirement date.

On January 29, 1991, IBM announced a redesign of the Retirement Plan which eliminated certain early retirement penalties and provided greater retirement benefits for those employees retiring on or after January 31, 1991. A later enhancement to the Retirement Plan made the redesigned plan retroactive to all employees retiring during and after 1991. The basis of plaintiffs' complaint is that IBM and/or its representatives induced them to participate in one of the early retirement programs available during 1990 and to retire prior to December 31, 1990, rather than utilize the Leave of Absence ("LOA") option, although the company was already preparing to implement an enhanced retirement plan for which plaintiffs would have been eligible if their retirement date had been set later through the LOA. Plaintiffs base their claims on alleged misrepresentations, both oral (in communications between employees and their managers) and written (in Summary Plan Descriptions of the VTP and LTPP).

The primary representation which plaintiffs allege was materially misleading was the oft-repeated statement that deferring the employee's retirement date through the LOA option would not be financially advantageous in most cases. Plaintiffs maintain the falsity of those statements is established by an affidavit made on behalf of IBM (the Miskovitz Declaration) in this lawsuit in which IBM calculated that based upon each class plaintiff's personnel record and actuarial calculations, 30 of 76 VTP Plaintiffs (39%) and 70 of 505 LTPP Plaintiffs (14%) would not have benefitted from the enhanced pension plan had they retired on or after January 31, 1991, based upon a present value calculation. This, of course, means that 61% of the VTP Plaintiffs and 86% of the LTPP Plaintiffs would have benefitted. They claim that the inducement to retire during a period in which the enhanced plan was being prepared was in breach of IBM's fiduciary duties under ERISA. Plaintiffs allege that they would have set later retirement dates but for the fraudulent inducements to retire under the VTP or LTPP.

Plaintiffs seek payment of funds by IBM into the Retirement Plan to provide them with the greater benefits to which they could have become entitled under the 1991 change in the Retirement Plan but for their retirements on or before December 31, 1990. Plaintiffs also seek equitable relief necessary to allow them access to benefits under the revised plan.

The development of the change in the Retirement Plan announced on January 29, 1991 began in July 1989, when Walter Burdick, IBM's Senior Vice–President of Personnel, requested Don Edman, Director of Personnel Programs, to staff a study on a redesigned pension plan. Subsequently, in July 1989, Edman placed Barry Voichick, Program Manager of IBM's Benefits Planning, in charge of this project. Voichick recruited others within the IBM organization to assist in this study, and he retained the services of the Wyatt Company, an actuarial firm, to assist him in developing a redesigned pension plan.

In November 1989, high level IBM executives (Michael Tarre, Director of Benefits for IBM U.S.; Lucian Montani, Program Manager of Retirement Programs; and Ken Johnson, Manager of Benefit Programs) became involved in the effort to develop a redesigned retirement plan. On December 4, 1989, Burdick, Edman, and Voichick informed Joe Grills, Chief Investment Officer of the IBM Retirement Fund, of redesign proposals to the Retirement Plan and noted that sometime in 1990 a task force would be established to complete the redesign proposals. On January 5, 1990, Voichick and Montani met again to consider the results of further redesign studies and in February 1990, the Wyatt Company had completed more studies on the costs associated with the redesigned pension plan. On February 13, 1990, Voichick met with Burdick and presented alternative design formats for the plan and turned the redesign project over to Montani and other upper-level management.

In April 1990, Michael Tarre established a redesign task force to conduct further studies on the Retirement Plan redesign. The first meeting of this task force occurred on April 23, 1990. There was disagreement

over various aspects of the design changes, such as (1) whether a thirty-year cap on service credits would generate negative reactions from employees and public officials; and (2) whether there should be a "jump start" for the cash balance plan. Because of these disagreements, the task force estimated a target date for the redesign announcement of about July 1, 1991.

On October 4, 1990, the personnel staff met with the Management Committee, a committee acknowledged by IBM to have the authority to approve changes in the plan for implementation. IBM termed the meeting a "for your information" meeting, and while the Committee expressed concerns with some aspects of the plan, the general result of the meeting was that the staff would prepare a final design and strategy for presentation in the next meeting.

In late 1990 or early 1991, the task force became concerned that news about the possible pension plan amendments was leaking to employees outside the "need to know" group. Because of this concern, the target date for the announcement of the Retirement Plan redesign was advanced from the July 1, 1991 target date. On January 23, 1991, the staff met with the Management Committee with a revised proposal. At that meeting, the Committee reviewed and recommended approval of the redesigned plan, subject to completion of further staff work on the employee communications aspect. When this was done, the Committee authorized the proposals to go forward for review by the Retirement Plans Committee.

The Retirement Plans Committee was composed of outside members of IBM's Board of Directors. It exercised its independent judgment as to whether the management-initiated Retirement Plan amendments would be in the corporation's best interests. On January 29, 1991, that Committee met and approved the proposed amendments. The plan became effective on January 31, 1991.

## II.

In 1994, the district court certified a class of plaintiffs smaller than that requested by the representative plaintiffs. The class was defined to be all former employees of IBM who had been employed at the Lexington plant and whose employment was terminated under the VTP or LTPP prior to December 31, 1990. All members of the class were retirement eligible or within five years of retirement eligibility at the time they left IBM's employ. Representative plaintiffs had requested a class certification which would have included all employees of IBM within the United States whose employment was terminated under the VTP or LTPP plans prior to December 31, 1990, and who were retirement eligible or within five years of retirement eligibility at the time they left IBM's employ. Because the district court focused on the issue of oral representations, which had been particularly alleged only in relation to the Lexington plant, rather than written representations, which had been alleged to have been uniform throughout IBM's facilities in the United States, it restricted the class to employees from the Lexington plant.

In 1996, the district court concluded that "serious consideration" of amending the IBM Retirement Plan had begun on October 4, 1990. It also concluded that IBM had a duty not to make negligent or intentional misrepresentations when communicating with plaintiffs after the date of "serious consideration," but that it did not have a duty of affirmative disclosure.

Based on the conclusion that serious consideration did not occur until October 4, 1990, the district court granted summary judgment to IBM as to all members of Plaintiff class who retired on or before October 4, 1990. It also concluded that neither plaintiffs nor IBM was entitled to summary judgment in respect to claims by those class members who retired after October 4, 1990, because there were genuine issues of material fact concerning the oral representations allegedly made by IBM representatives to members of the class and the plaintiffs' alleged reliance upon those representations.

In 1997, IBM made a second motion for summary judgment on the basis of a Sixth Circuit opinion in *Muse v. Int'l Bus. Machines Corp.*, 103 F.3d 490 (6th Cir.1996),

which was still pending at the time of the district court's earlier opinion. Plaintiffs also moved for reconsideration and amendment of the order and judgment due, in part, to two Third Circuit cases which had been decided only days before the district court's October 4, 1996 opinion: *Fischer v. Philadelphia Elec. Co.* ("*Fischer II*"), 96 F.3d 1533 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997); and *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544 (3d Cir.1996) (companion case to *Fischer II*). Upon reconsideration of the matter in view of the newer cases, the district court concluded that serious consideration had not occurred until January 23, 1991, after all members of the plaintiff class had retired and granted summary judgment to IBM as to the remainder of the plaintiff class.

### III.

On appeal from summary judgment, the appellate court reviews de novo those issues summarily decided by the trial court. *Muse*, 103 F.3d at 493. The summary judgment should stand if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). *Southeastern Oakland County Resource Recovery Auth. v. Madison Heights*, 5 F.3d 166 (6th Cir.1993).

### A. Serious Consideration:

■ Although an ERISA fiduciary is "generally not required to disclose changes in a benefit plan before it is adopted," *Muse*, 103 F.3d at 494, if an employer gives "serious consideration" to a change in plans, the employer has a "fiduciary duty not to make either intentional or negligent misrepresentations" to potential plan participants, *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir.1992), *cert. denied*, 508 U.S. 940, 113 S.Ct. 2416, 124 L.Ed.2d 639 (1993). This duty to avoid material misrepresentations "does not require the employer to predict an ultimate decision to offer a plan so long as it fairly discloses the progress of its serious considerations to make a plan available to

affected employees." *Id.* (citing *Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1164 (6th Cir.1988)). "A fiduciary 'has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship.'" *Id.* (quoting *Eddy v. Colonial Life Ins. Co. of America*, 919 F.2d 747, 750 (D.C.Cir.1990)).

■ "Serious consideration" does not occur until a company "focuses on a particular plan for a particular purpose." *Muse*, 103 F.3d at 494. The only further guidance *Muse* provides is to say that it is not "serious consideration" if an employer has only studied changes in plans "to gain a general appreciation of its options." *Id.* In this case, a more detailed analytical structure may be unnecessary, but it is useful to consider *Fischer II*, which delineated a relatively specific set of factors for determining serious consideration.

[W]e believe that the following formulation of serious consideration is appropriate: Serious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change.... [T]his formulation does not turn on any single factor; the determination is inherently fact-specific. Likewise, the factors themselves are not isolated criteria; the three interact and coalesce to form a composite picture of serious consideration. For purposes of discussion, we address each in turn.

The first element, a specific proposal, distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options. A company must necessarily go through these preliminary steps before its deliberations can reach the serious stage. This factor does not mean, however, that the proposal must describe the plan in its final form. A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support con-

sideration by senior management for the purpose of implementation.

The second element, discussion for implementation, further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy. It also protects the ability of senior management to take a role in the early phases of the process without automatically triggering a duty of disclosure. This factor recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants. These discussions are properly assigned to the preliminary stages of company deliberations. Consideration becomes serious when the subject turns to the practicalities of implementation.

The final element, consideration by senior management with the authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy. As noted, large corporate entities conduct regular or on-going reviews of their benefit packages in their ordinary course of business. These entities employ individuals, including middle and upper-level management employees, to gather information and conduct reviews. The periodic review process may also entail contacting outside consultants or commissioning studies. During the course of their employment, the employees assigned these tasks necessarily discuss their duties and the results of their studies. These discussions may include issues of implementation. The employees may also make recommendations to upper level management or senior executives. As a general rule, such operations will not constitute serious consideration. These activities are merely the ordinary duties of the employees. Until senior management addresses the issue, the company has not yet seriously considered a change.

Consideration by senior management is also limited to those executives who possess the authority to implement the proposed change. This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

*Fischer II,* 96 F.3d at 1539–40 (citation omitted).

### 1. *Muse: Focus on a particular plan for a particular purpose*

■ IBM clearly had a particular purpose in mind during the lengthy retirement plan redesign process in this case. It began and ended the process with the goal of making retirement more attractive and more feasible for long-term employees as a part of an overall plan of downsizing. A particular plan is less easy to decipher here, but it is clear that this court in *Muse* did not mean to indicate that a finalized plan in its ultimate incarnation is necessary. If it had meant that, it could have easily indicated that a finalized or adopted plan was required before the fiduciary obligations surrounding "serious consideration" became an issue. Instead, this court used the test of *focusing* on a particular plan for a particular purpose. In the case at bar, IBM had narrowed its options to the point where the final change in retirement plan was certain to include the removal of early retirement penalties, the major issue for the plaintiff class. Accordingly, the available evidence demonstrates the fulfillment of the *Muse* test for "a particular plan for a particular purpose" as of October 4, 1990, when the Management Committee, a group with the authority to approve the changes for implementation, considered plan options and directed personnel staff to proceed to a final design. Such consideration by a group with significant powers con-

stitutes the company's "focus" on a plan as required by *Muse*.

## 2. The Fischer II Three–Factor Test

IBM argues that the *Fischer II* test is more stringent than that of *Muse* and that it should be adopted by this court. Under the *Fischer II* test, however, as under the *Muse* test, the grant of summary judgment is still erroneous, as the available evidence demonstrates that the three factors for serious consideration were fulfilled in this case as of October 4, 1990, the date of the Management Committee meeting.

### a. Specific Proposal

Under *Fischer II*, the requirement of a "specific proposal" is intended to assure that serious consideration is not found to occur before a proposal is sufficiently concrete to support consideration by senior management. The proposal, however, does not need to be in final form. When the district court found serious consideration not to have occurred until January 23, 1991, it did not find that the three factors had coalesced until a finalized proposal was put before the Management Committee. This is contrary to not only the thrust, but also the very language of the Third Circuit's discussion of the first factor. Just as IBM may be said to have formulated a "particular plan" under the *Muse* test on or before October 4, 1990, it was working with a proposal which was specific enough to support consideration by senior management as of that date.

### b. Discussion for Purposes of Implementation

As of October 4, 1990, the retirement plan redesign process had reached the Management Committee, which had the power to approve a plan for implementation. Notwithstanding IBM's characterization of the meeting as a "for your information" meeting, the result of the meeting was that employees working on the plan were directed to finalize the plan's design strategy. It does not matter that the committee did not "implement" or "approve" a plan at that meeting and did not meet for that purpose. It was not a meeting simply for preliminary consideration of alternatives or strategy formulation; it is enough that the "practicalities of implementation," were a subject of the meeting. *See Fischer II*, 96 F.3d at 1540.

### c. Consideration by Senior Management

This is the factor upon which the district court purported to make its decision ("At most, the events at IBM in October 1990 encompass only the first two elements of the 'serious consideration' test."). Because it found that senior management was not sufficiently involved in the process to find serious consideration until the Management Committee was presented with a finalized proposal, it did not reach the other factors in any great detail. The district court erred, however, in its analysis of this factor in light of the facts of this case. *Fischer II* distinguishes periodic review discussions and recommendations to upper-level management which are in the ordinary course of an employee's duties from consideration by senior management with authority to implement changes. Although the district court found the Management Committee to be possessed with enough authority to suffice for this factor (it found serious consideration as of the date the Management Committee reviewed a finalized proposal), it felt that the three factors were not fulfilled until the senior management had seen a finalized proposal. This application of the factors is contrary to the language used in *Fischer II* where it states that a plan need not be in its final form in order for the three factors to coalesce to form an overall picture of serious consideration.

In this case, on October 4, 1990, the proposal was considered to be sufficiently concrete to present to senior management for discussion on issues of implementation. A meeting with the Management Committee, a group with the authority to approve a plan for implementation, was indeed held on that date and the outline of that meeting indicates that implementation strategies were discussed.

For the above reasons, serious consideration occurred on October 4, 1990. The district court therefore erred in granting summary judgment to IBM as to the claims of those members of the plaintiff class who

retired after October 4, 1990. Issues of material fact remain as to whether the alleged representations were in fact materially misleading and whether plaintiffs in fact relied upon those representations.

## B. Written Misrepresentations

Plaintiffs argue that the alleged written misrepresentations should not be subject to the "serious consideration" test. They rely on *Helwig v. Kelsey–Hayes Co.*, 93 F.3d 243 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997), for the proposition that representations contained in Summary Plan Descriptions are entitled to special protection under ERISA. *Helwig* held that employers and plan administrators are bound by promises in a Summary Plan Description even if it differs from the language of the plan. *Id.* at 250. It emphasized the importance of Summary Plan Descriptions to employees, saying that employees rely in particular on written promises when making decisions about retirement. *Id.* However, it did not speak to a duty to correct Summary Plan Descriptions which may have become misleading after their distribution to employees due to future events and plan amendments.

■ Plaintiffs present no sound basis for finding that the written representations became misleading at any time prior to the date of serious consideration. It seems, in fact, that it is only the serious consideration of plan enhancement that could have made the statement highlighted by the plaintiffs even arguably misleading. ("It should be noted that employees who are retirement eligible most likely will not find a financial advantage in this program [Leave of Absence option] since they would be deferring their retirement income until the end of their leaves.").

■ However, the court should not ignore the allegations of written materially misleading statements in the Summary Plan Descriptions in favor of the oral misrepresentations. Even if truthful when written, a representation can become misleading through future changes in events. When a representation is written, it is ongoing, and may become subject to a duty to correct if it in fact becomes misleading. A duty to correct can be found in the federal securities laws: offering materials must be correct and non-misleading at the time of sale, not just at the time they are written, and a duty to correct the materials continues as long as does the offering. *See, e.g., Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir.1991). The provision of ERISA which requires the publication and distribution of an "accurate" summary plan description, 29 U.S.C. § 1022(a)(1), when taken in conjunction with the fiduciary duties of the employer, 29 U.S.C. § 1104(a), imposes an analogous "duty to correct" upon an employer if and when the employer knows or should know that a statement in a Summary Plan Description has become misleading to potential participants. The time period in which the duty to correct continues would be the time in which employees may still choose to participate in the relevant plan. Just as offering materials must be correct and non-misleading under the securities laws during the time of offering, Summary Plan Descriptions should remain accurate and non-misleading throughout the availability of a plan.

■ A court should analyze not only potentially misleading oral representations but also the possible duty to correct an ongoing written representation as of the time of serious consideration.

## C. Class Certification

■ The standard of review of a trial court's class action certification is "abuse of discretion." *Mayer v. Mylod*, 988 F.2d 635 (6th Cir.1993).

■ The district court focused on the allegations of oral representations made by the plaintiffs in deciding to restrict the class to former employees of the Lexington plant based on lack of commonality. It noted that the particularized allegations of oral misrepresentations were only made in relation to employees of the Lexington plant. Although plaintiffs also rely upon the allegedly misleading written representations from the Summary Plan Descriptions, the necessity that allegations of representations be uniform among class members supports the dis-

trict court's restriction of the class to former employees of the Lexington plant.

The district court did not abuse its discretion when it restricted the class to include only those plaintiffs who were former employees of the Lexington plant and who retired under the VTP or LTPP plans.

### IV.

The grant of summary judgment to Defendant as to those members of the Plaintiff class retiring after October 4, 1990 is REVERSED, and the case is REMANDED to the district court for further proceedings. Summary judgment for all other retirees is AFFIRMED and the class certification is AFFIRMED.