Joan EDDY, Executor of the Estate of James Peter Eddy, Appellant,

v.

COLONIAL LIFE INSURANCE COMPANY OF AMERICA, Appellee.

No. 89–7206.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1990.

Decided Nov. 23, 1990.

---

Patricia A. Smith, with whom Dale Edwin Sanders, Alexandria, Va., was on the brief, for appellant.

Frank J. Martell, Washington, D.C., for appellee.

Before WALD, Chief Judge, MIKVA and RUTH B. GINSBURG, Circuit Judges.

WALD, Chief Judge:

Joan Eddy appeals from a district court ruling that the Colonial Life Insurance Company ("Colonial Life" or "Chubb") did not breach its fiduciary duty to her son, James Peter Eddy, despite Eddy's claim that he received misleading information which resulted in the termination of his health and life insurance coverage. We hold that the district court erroneously construed Chubb's fiduciary duty to Eddy; accordingly, we reverse the district court's decision and remand for further proceedings.

## I. BACKGROUND

In May 1986, James Peter Eddy was diagnosed as "HIV-positive," that is, as infected with the virus that causes Acquired Immune Deficiency Syndrome (AIDS). Eddy's doctors told him that he had one year to live. Undaunted, Eddy continued to work at Unitag, a Washington, D.C. travel agency, where he served as office manager. In the summer of 1987,

his condition worsened. He developed symptoms often associated with AIDS—fevers, vomiting, weight loss; he underwent medical treatment for those symptoms; and, at his doctor's direction, he scheduled exploratory surgery for Monday, September 14. Trial Transcript ("Tr.") at 13–14.

At his office on September 10, Eddy received a memorandum. Its brevity belied its gravity:

> Unitag's group health insurance policy [offered by Colonial Life] will terminate September 14, 1987. Any health costs you have incurred prior to September 14, 1987 will be covered by our present policy. *However, no expenses incurred on or after September 14, 1987 will be covered[; they will instead] be your responsibility.*
>
> Four Seas has not made it clear whether they will cover you immediately or not. So for your convenience, Nabil [Mounla, Finance Director] has found a company willing to cover individuals for short temporary periods. An information booklet and application are enclosed.

Joint Appendix ("J.A.") at 199 (emphasis supplied). Unitag, it seems, had come upon hard times and was being sold to Four Seas, another travel agency. Accordingly, Unitag was canceling its group insurance coverage, ostensibly leaving Eddy and its other employees uninsured.

Understandably concerned—surgery was scheduled for the coming Monday—Eddy reviewed the booklet attached to the memo; he found, unfortunately, that the new coverage described was not available in Washington, D.C. *See* J.A. at 200. He then called Mounla, who was responsible for Unitag's insurance coverage, but Mounla offered little help. Finally, Eddy telephoned Colonial Life directly; he told the agent that he was a Unitag employee and that his group policy benefits were being terminated. *Eddy v. Unitag World Travel Service, Inc. et al.*, No. 88–1038, Memorandum Opinion ("Mem. op.") (D.D.C. July 31, 1989) at 4, *reprinted in* J.A. at 11, 15.

What happened next is disputed. At trial, Eddy testified that the Chubb agent then consulted Unitag's policy and trans-

ferred the call to a man who identified himself as a supervisor. Eddy testified that he explained his situation to the supervisor and asked "about conversion rights underneath my policy"; the supervisor "said that [Eddy] did not have the right to convert [his employment-based coverage] to an individual policy." Tr. at 20. Witnesses for Chubb testified that they had no record of Eddy's call, but admitted that the company did not keep complete records of such calls. They also testified that, contrary to Eddy's testimony, none of the agents in the department to which Eddy's call should have been directed were men. Mem. op. at 9, J.A. at 20.

Eddy did not "convert" his insurance coverage and at midnight on September 13–14, his coverage ended. Now uninsured, Eddy postponed his surgery. On September 14, instead of going to the hospital, Eddy went to his new job at Four Seas Travel.

As witnesses for Chubb would later testify, Eddy did in fact have a right to convert his insurance coverage, a right to extend his coverage even though Unitag's group policy had been terminated. *See* J.A. at 180, 194–95. Had he so converted his coverage and kept current his premium payments, Eddy would have retained his health and life insurance benefits. In April 1988, Eddy filed suit in the District Court for the District of Columbia, contending *inter alia*[1] that, in its dealings with Eddy, Chubb had violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*

Eddy did not stay long at Four Seas, in part because he had been demoted from office manager to reservationist. After a few days, he resigned. His health deteriorated, and several months later, James Eddy moved to Florida to be closer to his mother. Tr. at 25–26.

At a bench trial in July 1989, Eddy testified about his telephone conversations with Mounla and Chubb. His testimony was supported by that of Edward Ryan, Eddy's coworker, who shared an office with Eddy and overheard his telephone conversations with Mounla and Chubb. Mem. op. at 8, J.A. at 19. Mounla, Unitag's financial director, also testified and offered indirect support for Eddy's claim by explaining how he, too, had been told by Chubb that "existing benefits could not be converted to individual policies." Mem. op. at 6, J.A. at 17. Witnesses for Chubb discussed the absence of any record of Eddy's call and the general procedures for handling such inquiries.

In a memorandum opinion, the district court ruled for the insurance company, reasoning that Eddy's claims hinged on whether "he asked about his *conversion* rights and not about his ability to *continue* his coverage." Mem. op. at 10 (emphasis supplied), J.A. at 21. An employee's insurance coverage may be "continued" when his employment is terminated (or he otherwise becomes ineligible) but the employer's group policy remains in effect. An employee's coverage may be "converted" from a group to an individual policy when an employee is terminated or becomes ineligible or when, as in this case, the underlying group plan is itself terminated. Continuation rights are governed by state and federal laws; conversion privileges are established by the provisions of the particular policy. In this case, although Eddy did have the right to *convert* his coverage, he did not have the right to *continue* that coverage, because Unitag had cancelled its group plan. Refusing to credit the testimony of Eddy and Ryan to the contrary, the district court found that Eddy had not "demonstrated ... that he used the word 'convert' or otherwise properly communicated to Chubb his desire to convert" his coverage. Mem. op. at 10, J.A. at 21.

Eddy subsequently developed Kaposi's Sarcoma, a form of cancer associated with the later stages of AIDS. He started a

---

1. Eddy's initial complaint also stated a number of common law and state law claims and implicated several parties in addition to Chubb. Before trial, all of the claims except those against Chubb were dismissed or withdrawn. *See Eddy v. Unitag World Travel Service, Inc. et al.,* No. 88–1038, Memorandum Order (D.D.C. June 28, 1989). Moreover, as counsel for Eddy conceded at oral argument, only the claims concerning conversion of Eddy's life and health insurance survive Eddy and are therefore before this court.

new job in Florida, but his new insurance coverage did not extend to pre-existing conditions. By July 1989, Eddy's medical expenses totalled several thousand dollars. Tr. at 14, 22.

In August, Eddy appealed the district court's decision. Before his case could be argued in this court, James Peter Eddy died. His mother, the executor of his estate, now carries on this appeal.

## II. ANALYSIS

■ This case centrally concerns the scope of an insurance company's duty to one of its insured. We find that the standard of care articulated by the trial court was too narrow and hold that a fiduciary in Chubb's position has a duty upon inquiry to convey to a lay beneficiary like Eddy correct and complete material information about his status and options when a group policy is cancelled—a duty that, in this case, Chubb apparently failed to fulfill.

Chubb concedes that it is a fiduciary within the meaning of § 1104 of ERISA, 29 U.S.C. § 1104. Mem. op. at 12, J.A. at 23. As such, Chubb is obligated to

discharge [its] duties with respect to a plan ...

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

29 U.S.C. § 1104(a)(1). As this section suggests, the duties of an ERISA fiduciary are not limited by that statute's express provisions but instead include duties derived from common law trust principles. "[R]ather than explicitly enumerat[e] all of the ... duties [of ERISA fiduciaries], Congress invoked the common law of trusts to define the general scope of their ... responsibility." *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985) (citation omitted); *see also* H.Rep. No. 93-533, 93d Cong., 2d Sess. at 11–12, *reprint-ed in* 1974 U.S.CODE CONG. & ADMIN. NEWS 4639, 4649.

■ The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA. At the request of a beneficiary (and in some circumstances upon his own initiative), a fiduciary must convey complete and correct material information to a beneficiary. As the Restatement (Second) of Trusts states:

[The trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person....

Restatement (Second) of Trusts § 173, comment d (1959). This fundamental common-law duty informs many of the statutory requirements of ERISA itself. Under ERISA, a plan administrator must, for example, furnish to all beneficiaries and participants a summary plan description (29 U.S.C. § 1024(b)), notice of "any material modification" in the plan (29 U.S.C. § 1022(a)), and, upon request, a wide range of plan-related information (29 U.S.C. § 1025(a)).

■ A fiduciary's duty, however, is not discharged simply by the issuance and dissemination of these documents and notices. Instead, that duty carries through in all of the fiduciary's dealings with beneficiaries; in general, "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence ... are owed." *Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1163 (6th Cir.1988). A fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship. For example, a fiduciary bears an affirmative duty to inform a beneficiary of the fiduciary's knowledge of prejudicial acts by an employer—such as the failure of an employer to contribute to a fund as required. *Dellacava v. Painters Pension Fund*, 851 F.2d 22, 27 (2d Cir.1988); *Rosen v. Hotel and Restaurant Employees Un-*

*ion,* 637 F.2d 592, 599–600 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981); *cf. Phillips v. Kennedy,* 542 F.2d 52, 55 n. 8 (8th Cir.1976). Similarly, in certain circumstances, when an ineligible person contributes to a fund, a fiduciary has a duty to "inform him of his ineligibility within a reasonable time after the [fiduciary] acquired knowledge of that ineligibility." *See Aitken v. IP & GCU–Employer Retirement Fund,* 604 F.2d 1261, 1270 (9th Cir.1979). "A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word." *Globe Woolen Co. v. Utica Gas & Electric Co.,* 224 N.Y. 483, 489, 121 N.E. 378, 380 (1918) (Cardozo, J.).

This duty to disclose and inform governs the case before us. The trial court found that Eddy called Chubb, identified his employer, and stated that his coverage was ending. Mem. op. at 4, J.A. at 15. As soon as Eddy did this, Chubb bore a fiduciary duty to convey correct and complete information material to Eddy's circumstance. This information would include the inapplicability of "continuation" provisions, the availability of "conversion" options, and the procedures for converting Eddy's health and life insurance coverage.[2]

The trial court, however, construed Chubb's fiduciary duty too narrowly. The court stated that:

Plaintiff must prove by a preponderance of the evidence that defendant prevented him from exercising his conversion rights. To do so, he must prove that defendant *misinformed* him with respect to his right to convert the policy.

Mem. op. at 12, J.A. at 23 (emphasis supplied). However, refraining from imparting misinformation is only *part* of the fiduciary's duty. Once Eddy presented his predicament, Colonial Life was required to do more than simply *not misinform,* Colonial Life also had an affirmative obligation to *inform*—to provide complete and correct material information on Eddy's status and options.

Thus, although the trial court found that "[t]he issue in this case ... is whether plaintiff ... used the term 'convert' as opposed to 'continue,'" Mem. op. at 12, J.A. at 23, such a constricted standard of fiduciary duty is counter to both the letter and the spirit of the common law of trusts. Regardless of the precision of his questions, once a beneficiary makes known his predicament, the fiduciary "is under a duty to communicate ... all material facts in connection with the transaction which the trustee knows or should know." Restatement (Second) of Trusts § 173, comment d (1959). Eddy should not be penalized because he failed to comprehend the technical difference between "conversion" and "continuation." The same ignorance that precipitates the need for answers often limits the ability to ask precisely the right questions.

This duty to communicate complete and correct material information about a beneficiary's status and options is not a novel one. Chubb expressly invited telephone inquiries from beneficiaries. According to the testimony of Chubb's counsel and assistant secretary, Chubb maintained a separate unit charged in part with "taking phone calls" and "handl[ing] questions" about the conversion of insurance coverage. Tr. at 120. Chubb also maintained several toll-free telephone lines—including one dedicated to questions about the conversion of coverage. Trial Exhibit C. Finally, and perhaps most significantly, Chubb provided insured persons with a description of conversion options in a document that expressly directed beneficiaries: "*If you have any questions, please contact the Group Insurance Department.*"[3] *Id.* (emphasis supplied).

---

2. The conversion privileges under Eddy's health and life insurance coverages are virtually identical. *Compare* J.A. at 180 *with* J.A. at 195. Accordingly, Chubb's fiduciary duties to Eddy under the two coverages are also identical.

3. *Cf. Castello v. Gamache,* 593 F.2d 358 (8th Cir.1979). In *Castello,* the court affirmed a ruling that pension fund trustees did not violate their fiduciary duty by failing to notify a terminated employee of her conversion rights. However, in *Castello,* there was "nothing in the record to suggest that the defendant trustees

Indeed, the eminent reasonableness of this obligation was well demonstrated by the testimony of Chubb's own witness, Marlene Schubert. Schubert, employed by Chubb for more than 25 years, worked in the department that fielded inquiries such as Eddy's. Her testimony on direct examination included the following exchange:

Q. If you were to receive a call from an employee of a company who had a group policy with Chubb Life inquiring as to whether or not coverage would be provided after the expiration date of the policy, either canceled by the insured or for some other reason, what would you tell that person making the inquiry?

A. Well, I would inquire as to the reason for termination of the plan, and I would then advise them of the rights that they have, whether they be continuation under state or federal laws or conversion privilege.

Q. Has it been your experience that most people when calling don't recognize the distinction between continuance and conversion?

A. This is true.

Q. And do you explain to them very carefully what is meant by the difference?

A. Yes, we do.

J.A. 164–65. Schubert's testimony suggests a practice that fully comports with Chubb's fiduciary duty under ERISA and that renders inexplicable its omission in Eddy's case.[4]

Chubb emphasizes the trial court's finding that Eddy "did not write a letter or further contact the insurance company with respect to the termination of his health benefits after [his] phone calls [to

Mounla and Chubb]." Mem. op. at 5–6, J.A. at 16–17. But this emphasis also distorts the duties involved. *Eddy* did not have a duty to try and try again until he received correct and complete information. Once Eddy had made clear his situation, *Colonial Life* had a duty to provide the material information.

We hold, therefore, that the district court employed an erroneous legal standard as to Chubb's duty to disclose once Eddy sought assistance. Once Eddy indicated his predicament to Chubb representatives, Chubb bore a fiduciary duty under ERISA to convey to Eddy complete and correct material information as to his status and his conversion options. This duty is well-rooted in the common law of trusts; as Judge Cardozo noted more than 70 years ago:

> The trustee is free to stand aloof, while others act, if all is equitable and fair. He cannot rid himself of the duty to warn and to denounce, if there is improvidence or oppression, either apparent on the surface or lurking beneath the surface, but visible to his practiced eye.

*Globe Woolen Co.*, 224 N.Y. at 489, 121 N.E. at 380.

We therefore reverse the decision below and remand for proceedings consistent with this opinion.

---

kn[e]w, or had any reason to know" the fact of termination. *Id.* at 360. In contrast, in this case, the trial court found that Eddy called and informed Chubb of his situation; this notification triggered Chubb's duty to disclose and inform.

4. The trial court's finding of fact with regard to Schubert's testimony is clearly erroneous. The court found that Schubert

> testified that the operators generally did not make judgments with respect to whether a customer appeared confused ... but rather

determined what services he or she required in order to send the customer the appropriate application form.

Mem. op. at 9, J.A. at 20. Upon reviewing Schubert's testimony, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citation omitted); *see also* Fed.R. Civ.P. 52(a). We thus set aside the trial court's finding number 40 as clearly erroneous.