**HARRISON, et al. and Schultz, et al., Plaintiff(s),**

v.

**UAW L599 et al. and UAW L659, et al., Defendant(s).**

Nos. 00–72345, 00–73368.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 10, 2001.

552

Norbert B. Leonard, Kelly A. Kruse, Leonard Kruse, Bloomfield Hills, MI, for plaintiffs.

Samuel C. McKnight, Klimist, McKnight, Southfield, MI, for United Auto., Aerospace and Agricultural Implement Workers of America, Local 599, defendant.

David M. Davis, Hardy, Lewis, Birmingham, MI, for General Motors Corp., defendant.

## OPINION & ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This matter came before the Court on Defendants' motion summary judgment. For the reasons set forth below, Defendant General Motors motions are GRANTED and Defendants UAW L599 and UAW L659 motions are GRANTED.

On September 20, 2000 this Court consolidated cases 00–72345 and 00–73368 (*Harrison, et al. v. UAW L599, et al.* and *Schultz, et al. v. UAW L659, et.al.*, respectively) for discovery purposes only; since the issues pertaining to both these cases are similar, it is appropriate to discuss both cases in a single opinion.

### I. Facts

Plaintiffs are retired employees of General Motors Corp. ("GM") and union members of United Automobile Aerospace Agricultural Implement Workers of America International Union Local 599 ("UAW L599")[1] and United Automobile Aerospace Agricultural Implement Workers of America International Union Local 659 ("UAW L659").[2]

1. The following is a list of all Plaintiffs in the *Harrison* case, and the approximate dates of their retirement:

| October 1, 1999 | George Bunce | John McTaggert |
| | Edward Chavey | Gary Schlict |
| | Robert Crane | James Stewart |
| | Marvin Foster | Vaughn Van Warmer |
| | William Lab | Calvin Walk |
| | Alfred McGee | |
| November 1, 1999 | Randolph Ives | William Link |
| | Walter Kom | |
| November 14, 1999 | Marvin Prime | |
| January 1, 2000 | William Beers | Walter Rosinski |
| | Lavelle Earl | |
| | Michael Harrison | Donald Williamson |
| | Ronald Miller | |
| January 11, 2000 | Chajes Coons | |
| February 1, 2000 | Lary Gotham | William Warner |
| | Joseph Green | |

2. The following is a list of all Plaintiffs in the *Schultz* case, and the approximate dates of their retirement:

| October 1, 1999 | Michael Adams |
| | Patrick Boughner |
| | Charles Brown |
| | Wilma Fann |
| | Norma George |
| | Mildred Higgins |
| | Roger Lee |
| | Paul Wills |
| November 1, 1999 | Ronald Henson |
| | Charles Pressley |
| December 1, 1999 | Ernest Elizando |
| January 1, 2000 | James Washington |
| | Rod Rothermel |

On July 2, 1999 General Motors closed the Buick City portion of its Flint Buick site.[3] On October 1, 1999, General Motors closed the Flint V–8 Engine plant.[4] Upon the closing of both plants, Plaintiffs were not laid-off by GM, but rather were required under the GM–UAW national agreement to be retained as active employees in the JOBS Bank. While in the JOBS Bank, employees continued to collect full pay and were required to report to a GM facility every day and be available for work. In the past, when a plant closed, GM sometimes offered employees incentives to retire, thereby decreasing its payroll obligations. Defendants UAW L599 and UAW L659 point out that all union members, including Plaintiffs, were well aware of this practice, and thus hoped that GM would offer retirement incentives this time as well.

In early 1999, before either of the plants closed, UAW Local 599 President Art McGee and UAW Local 659 President Norm McComb requested that the International Union seek GM's agreement for a retirement incentive package for their members. Both presidents reported to their members that only the International Union could negotiate such a package, and that no member of the local unions had any knowledge of the ongoing negotiations. The local unions contacted the International Union approximately twice a month to inquire about the status of Local 599's request for retirement incentives, and each time the International responded that they had heard nothing.

In late October and early November, 1999, the Flint Journal published articles about the GM Jobs Bank and the complaints from employees in the Bank regarding the condition of the Coldwater facility to which JOBS Bank employees were required to report. Complaints included allegations that the facility did not have adequate heat, that there were no on-site food facilities and no convenient off-site eating places and that there was a lack of on-site medical services. *See* Defendant's Exhibit B. This information is germane to the present case because the Court must determine at what point GM began "seriously considering" offering a new Special Attrition Plan ("SAP") to its employees.[56]

Defendant GM claims that there were not sufficient retirements during the peri-

---

February 1, 2000       Michael Schulz

**3.** Plaintiffs in the *Harrison* case, who were former members of UAW L599, were employed at Buick City prior to their retirement.

**4.** Plaintiffs in the *Schulz* case, who were members of UAW L659, were employed at the Flint V–8 Engine plant prior to their retirement.

**5.** "Serious Consideration" is a legal term defined by case law; this will be discussed in the analysis portion of this opinion.

**6.** The Special Attrition Plan gave GM employees the following three options if they retired effective August 1, 2000:
Option 1: Receive $15,000 Vehicle Voucher and $10,000 cash.
Option 2: Receive $25,000 cash.

Option 3: Receive a Mutually Satisfactory Retirement (age 50–61 with 10 or more years of credited service). This option allows for immediate commencement of monthly pension benefits, unreduced for age, receipt of a Temporary Benefit (social security make-up benefit) payable until attainment of age 62, and continued health care and life insurance coverage.
The SAP was to be offered to a maximum of 400 production employees and to all eligible skilled trades employees (approximately 259). In the event that more than 400 production employees indicated an interest in the plan, the SAP was to be offered to the production employees in longest unbroken GM seniority order.

od from October 1, 1999 through December 1999, to substantially reduce the numbers of employees in the overcrowded JOBS Bank. GM claims it was not until January 2000 that it recognized that an offer of incentives to retire might assist in reducing the number of employees in the JOBS Bank. GM argues that they would not have offered the SAP unless it received relief from "attritional replacement" from the International Union.[7] GM claims that its first contact with the International Union did not occur until January 9, 2000. *See* Spring Deposition p. 13.

The negotiations between GM and the International Union culminated in an agreement that was signed on February 14, 2000, just one day before the company-wide announcement of the SAP. GM asserts that it did not "seriously consider" offering the retirement incentives until the February 14, 2000 agreement to relax the attritional replacement requirement was reached with the International Union.

Plaintiffs claim that GM must have been seriously considering the SAP well before GM admits to doing so. Plaintiffs are convinced that GM's insistence that its laid-off employees report to the overcrowded JOBS Bank was an effort by GM to swell the pre-SAP retirement ranks.

As mentioned above, on February 15, 2000, after Plaintiffs retired, Defendants announced the SAP that offered enhanced retirement benefits to certain employees. Plaintiffs argue that they would have been eligible for the Plan if they had not retired prior to being informed of the Plan. Plaintiffs also allege that, prior to resigning, they individually made multiple inquiries to Defendants regarding an enhanced retirement plan. Defendants informed them, however, that they would not offer such a plan. In addition to these alleged misrepresentations, Plaintiffs argue that Defendants had a fiduciary duty to inform them when GM was seriously considering such a plan.

Plaintiffs, by their Second Amended Complaint filed July 31, 2000, contend that GM, as administrator of the GM Pension Plan, breached its fiduciary duty under section 404 of the Employee Retirement Income Security Act of 1974, as amended, ERISA, 29 U.S.C. § 1104, by making misrepresentations and by failing to inform Plaintiffs of upcoming incentives. Plaintiffs make similar claims against their local unions (UAW L599 & UAW L659), alleging that the local unions failed to advise Plaintiffs of upcoming incentives and provided Plaintiffs false and misleading information thereby violating the Labor Management Relations Act, LMRA, 29 U.S.C. § 185.

## II. Analysis

### A. Standard for FED.R.CIV.P. 56(c) Motion for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case

---

**7.** Jennie Spring, a member of GM's Industrial Relations Staff, explained in an affidavit that "attritional replacement" is a requirement under the GM–UAW National Agreement for GM to replace employees who retired ("attritional replacement").

and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## B. General Motors' Motions

It is well settled that Administrators of a pension plan owe the participants of that plan a fiduciary duty. *See Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The genesis of this duty is embodied in ERISA. ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." *Id.* quoting ERISA § 404(a). The scope of this rule concerning fiduciary liability with respect to representations and disclosures in the context of contemplated plan changes has been clarified in case law decided after *Varity Corp. v. Howe.*

■ *Muse v. IBM Corp.,* 103 F.3d 490 (6th Cir.1996) held that employers generally have no fiduciary duty under ERISA regarding adoption, modification, or termination of employee benefit plans. However, if an employer gives serious consideration to implementing changes, then an employer does have a fiduciary duty under ERISA not to make misrepresentations to potential plan participants about the new offering. Misrepresentations made before serious consideration trigger no such duty. Therefore, this Court concerns itself with two issues when deciding the motions for summary judgment filed by GM. First, when did GM seriously consider offering a new SAP to its employees, and second, did GM make any misrepresentations to its employees after such serious consideration.

GM's motions will be GRANTED on four separate grounds, and all claims against GM will be dismissed. The reasons for the dismissal of each individual Plaintiff will overlap, however each will be dismissed. The four overlapping groups of Plaintiffs include: (1) Plaintiffs who retired prior to January 1, 2000; (2) Plaintiffs who would not have been eligible for the SAP even if they had retired later; (3) Plaintiffs who did not ask GM if a new SAP was being contemplated; and (4) Plaintiffs who did ask GM if a new SAP was being contemplated, but received no misleading information.

### 1. Serious Consideration

In *Muse,* the 6th Circuit Court of Appeals gave the following guidance as to when "serious consideration" occurs:

> The exception of serious consideration does not apply until a company focuses on a **particular plan for a particular purpose** (emphasis added). An unique event, the sale of [an IBM plant], triggered the offering of the enhanced plan.

Although the sale had been contemplated earlier along with other options for the [IBM plant], it was not until IBM made a definite decision to sell [its] plant and was told by the buyer that further downsizing was necessary that IBM focused on this particular plan for a particular purpose.

*Muse* at 494.

In *McAuley v. IBM,* 165 F.3d 1038 (6th Cir.1999), the Court further clarified this issue. It reiterated the rule in *Muse,* and then referred to what is arguably the leading case on serious consideration, *Fischer v. Philadelphia Electric Company,* 96 F.3d 1533 (3rd Cir.1996), *cert denied,* 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997)(referred to as *Fischer II*). The following is a quotation from *Fischer II* that outlines a three pronged test to determine when serious consideration has occurred:

[W]e believe that the following formulation of serious consideration is appropriate: Serious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change.... [T]his formulation does not turn on any single factor; the determination is inherently fact-specific. Likewise, the factors themselves are not isolated criteria; the three interact and coalesce to form a composite picture of serious consideration. For purposes of discussion, we address each in turn.

The first element, a specific proposal, distinguishes serious consideration from the antecedent steps of gathering Information, developing strategies, and analyzing options. A company must necessarily go through these preliminary steps before its deliberations can reach the serious stage. This factor does not mean, however, that the proposal must describe the plan in its final form. A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation.

The second element, discussion for implementation, further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy. It also protects the ability of senior management to take a role in the early phases of the process without automatically triggering a duty of disclosure. This factor recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants. These discussions are properly assigned to the preliminary stages of company deliberations. Consideration becomes serious when the subject turns to the practicalities of implementation.

The final element, consideration by senior management with the authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy. As noted, large corporate entities conduct regular or on-going reviews of their benefit packages in their ordinary course of business. These entities employ individuals, including middle and upper-level management employees, to gather information and conduct reviews. The periodic review process may also entail contacting

outside consultants or commissioning studies. During the course of their employment, the employees assigned these tasks necessarily discuss their duties and the results of their studies. These discussions may include issues of implementation. The employees may also make recommendations to upper level management or senior executives. As a general rule, such operations will not constitute serious consideration. These activities are merely the ordinary duties of the employees. Until senior management addresses the issue, the company has not yet seriously considered a change.

Consideration by senior management is also limited to those executives who possess the authority to implement the proposed change. This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

*Fischer II* at 1539–1540

■ Under either the three-prong test in *Fischer II* or the test explained in *Muse*, the Court finds that GM did seriously consider offering a new SAP to its employees prior to February 14, 2000. GM bases its position on the fact that it did not reach an agreement with the International Union until this date. The facts indicate that the SAP was announced to GM employees and implemented on February 15, 2000, just one day after GM claims to have first seriously considered offering a new plan. Plaintiffs argue that GM's serious consideration of the SAP must have predated the retirement of all the Plaintiffs.

To support this claim, Plaintiffs direct the Court to Jennie Spring's deposition, which explains that GM entertains the need for a SAP "at a point in time when it [GM] has excess employees with very unlikely opportunities for jobs." According to Ms. Spring, GM analyzes its work force on a monthly basis to determine whether or not GM has excess employees with poor future job opportunities. *See* Plaintiffs Exhibit J (Spring deposition at page 11). Plaintiffs' brief continues further by addressing each of the three prongs of the test contained in *Fischer II*.

Regarding the first prong, a specific proposal, Plaintiff points out that GM made a proposal to the Union with respect to offering a SAP to qualified employees as early as the fall of 1999. Plaintiff goes on to argue that although this proposal was rejected by the Union, it was sufficiently similar to that which was ultimately agreed upon to at least create a question of fact under this prong of the test. *See* Plaintiffs' Exhibit H (Warner deposition at pages 46 and 103–109). The document relied on by Plaintiffs to support this contention is not an agreement between GM and any union, but rather is a request by the local unions that GM consider offering a SAP. *See* Plaintiff's Exb. G and I.

Defendant counters this argument by again claiming that no "specific proposal" was created until a final agreement was reached with the International Union regarding relief from attritional replacement. However, in *McAuley* the Court clarified its position in *Muse* by stating "it is clear that this court in *Muse* did not mean to indicate that a finalized plan in its ultimate

incarnation is necessary." *McAuley* at 1044.

■ Turning to the second prong, discussions regarding implementation, Plaintiffs again direct the Court's attention to Jennie Spring's deposition, which suggests that GM prepared a monthly cost/benefit analysis of potential SAP's. *See* Plaintiff's Exhibit H (Spring deposition at page 11). Plaintiffs then arrive at the conclusion that discussions concerning implementation obviously must have preceded GM's initial proposal to the union. The above quoted language from *Fischer II* indicates that Plaintiffs reach back too far in their attempt to define serious consideration. Periodic review of benefits alternatives does not rise to the level of serious consideration until the subject turns to the practicalities of implementation. *See Fischer II* at 1539–1540.

Finally, regarding the third prong, consideration by senior management, Plaintiffs submit that Jennie Spring had the authority to decide to offer a SAP to the union. Thus, it was not necessary to seek the approval of the Board of Directors or any other internal body before doing so. *See* Plaintiffs' exhibit J (Spring deposition at pages 38–39).

Given the above information, the Court finds that Plaintiffs have raised a genuine issue of material fact as to whether GM "seriously considered" offering a new SAP to its employees before the February 14, 2000 date urged by GM; however, the evidence only supports such an inference as far back as the beginning of January, 2000. Deposition testimony from Mr. Dean Munger and Ms. Jennie Spring, both members of the GM Industrial Relations Staff, indicate that GM first approached the International Union on January 9, 2000 regarding the possibility of a new SAP. Although the offers extended by GM to the International Union at the beginning

of January, 2000 did not exactly replicate the ultimate incarnation of the SAP offered on February 15, 2000, the evidence is sufficiently solid to support a finding that GM "seriously considered" this new offering at the beginning of January, 2000. GM may have considered the feasibility of offering a new SAP to its employees prior to this point, however these preliminary studies do not trigger the "serious consideration" stage contemplated by *Fischer II*. The Plaintiffs fail to provide the Court with sufficient evidence to convince it that "serious consideration" could have occurred any earlier than this. As quoted above in *Muse*, "serious consideration" requires that a company focus "on a particular plan for a particular purpose" and the facts in this case clearly indicates that this focus did not occur until January 2000. Accordingly, any Plaintiff who retired prior to January 1, 2000 must be dismissed from this lawsuit.

### 2. Misrepresentation

Even if the Court is satisfied that a genuine issue of material fact exists as to whether GM seriously considered offering a new SAP to its employees before the retirement of any or all of the Plaintiffs, the Court must also ask if GM made misrepresentations to the Plaintiffs regarding the possibility of the new plan. As stated earlier, although an ERISA fiduciary is "generally not required to disclose changes in a benefit plan before it is adopted," *Muse* at 494, if an employer gives "serious consideration" to a change in plans, the employer has a "fiduciary duty not to make either intentional or negligent misrepresentations" to potential plan participants. *McAuley* at 1043 quoting *Drennan v. GM Corp.*, 977 F.2d 246, 251 (6th Cir. 1992).

■■ This duty to avoid material misrepresentations "does not require the em-

ployer to predict an ultimate decision to offer a plan so long as it fairly discloses the progress of its serious considerations to make a plan available to affected employees." *Id.* (citing *Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1164 (6th Cir.1988)). Finally, "a fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship." *Id.* (quoting *Eddy v. Colonial Life Ins. Co. of America*, 919 F.2d 747, 750 (D.C.Cir.1990)).

■ At the outset, it is important to note that several Plaintiffs in the *Harrison* case would not have been eligible for the SAP even if they had retired under the plan, since they did not have enough seniority to qualify for the plan.[8] Additionally, *Harrison* Plaintiff Stewart would not have been eligible for the SAP because he was disabled from doing his regular job, which was a requirement of participation. *See* Defendant GM's brief in the *Harrison* case at page 13. These Plaintiffs are dismissed from the lawsuit as they do not have a valid claim against GM.

■ Defendant GM contends that various other Plaintiffs have no claim because they never inquired as to the possibility of the offering of retirement incentives prior to their retirement.[9] Additionally, Defendant GM argues that the Plaintiffs who actually did inquire about the possibility of new retirement incentives, did not rely on or receive any misleading information.[10]

The first of Defendant GM's contentions (that several Plaintiffs never even contacted GM) is supported by deposition testimony. *See* Appendices A of Defendant GM's briefs for each the *Harrison* and *Schultz* cases.

Defendant GM's second contention (that the Plaintiffs who did contact GM neither relied on nor received misleading or incorrect information) is founded on the premise that this group of Plaintiffs only spoke with their respective foremen, and did not speak with a member of GM's personnel or benefits staff. *See* Appendix B of Defendant GM's brief for the *Harrison* case and page 25 of Defendant GM's brief for the *Schultz* case. Since these Plaintiffs spoke only with their foremen, Defendant argues that Plaintiffs received no misinformation as the foremen had no knowledge of the contemplation of a new SAP. Each foreman responded to Plaintiffs queries by advising that they had not heard of any upcoming retirement incentives. Defendant contends that these were true statements at the time the foremen made them.

Plaintiffs submit that the above arguments pose GM's fiduciary obligation too narrowly. First, Plaintiff contends that once GM began seriously considering a new SAP, that GM had an affirmative duty to apprize Plaintiffs of the possibility of

---

8. Specifically, *Harrison* Plaintiffs Beers, Earl, Green (deceased) and McGee would not have been eligible for the retirement incentive plan even if they had retired after the announcement of the incentive plan. *See* Defendant GM's brief regarding the *Harrison* case at pages 10–12

9. Specifically, Defendant contends that in the *Harrison* case, Plaintiffs Crane, Foster, Gotham, McGee, Link, Miller, Rosinski, Schlicht, Van Wormer and Williamson never inquired

as to the possibility of retirement incentives prior to their retirement.

In the *Schultz* case, Defendant contends that Plaintiffs George, Henson, Higgins and Lee never inquired as to the possibility of retirement incentives prior to their retirement.

10. From the *Harrison* case, these Plaintiffs include: Coons, Harrison and Warner.

From the *Schultz* case, these Plaintiffs include: Rothermel, Schultz and Washington.

the new plan. In support of this argument, Plaintiff refers to *McAuley:* "a fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the relationship." *Id.* at 1043 (quoting *Eddy v. Colonial Life Ins. Co. of America,* 919 F.2d 747, 750 (D.C.Cir. 1990)).

Furthermore, Plaintiffs attempt to include every retiree who retired prior to the announcement of the SAP (including the Plaintiffs who admittedly never asked GM about the potentiality of a new SAP) in the aggrieved group by arguing that the act of submitting their retirement papers, which were cosigned by GM personnel staff, was sufficient to put GM on notice that any information relating to a new SAP was material to Plaintiffs. The parties have not cited a 6th Circuit case discussing this issue, however, *Bins v. Exxon Company, U.S.A.,* 220 F.3d 1042 (9th Cir. 2000), white not directly on point, is instructive.

In *Bins,* the 9th Circuit addressed whether employers have an ongoing duty to update employees who inquire regarding incentives:

> A more difficult question concerns employees who inquire and who are correctly told at that time that no serious consideration has occurred: If the employer subsequently reaches the serious consideration stage, does it have a duty to go back and inform those employees who had previously inquired and who the employer knows have not yet retired? The answer turns on the precise content of the employee's inquiry.
>
> If an employee, in the course of inquiring about possible plan changes, asks to be kept abreast of any changes in the status of a potential change and the employer provides assurances to

that effect, then the employer will have a fiduciary duty to follow up with that employee. In such a situation, the employer should know that silence on its part thereafter conveys an implicit message that no serious consideration has occurred and that the employee will rely on that silence to his or her detriment. *Cf. Varity,* 516 U.S. at 505, 116 S.Ct. 1065 (noting that "plan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits"); *Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993) ("Th[e] duty to inform ... entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.").

We decline, however, to impose on employers a duty to follow up an employee's inquiry in the absence of an assurance from the employer that it will provide an update. Such a requirement would extend an ERISA plan administrator's fiduciary duty beyond conveying truthful information and any discretionary duties it has assumed, and thus would be inconsistent with Varity. No other court has so extended a fiduciary's duty to disclose. Contrary to Bins' suggestion, *Eddy v. Colonial Life Ins. Co.,* 919 F.2d 747 (D.C.Cir.1990), does not go so far. Eddy's broad dictum that "[a] fiduciary has a duty not only to inform a beneficiary of new and relevant information as it arises, but also to advise him of circumstances that threaten interests relevant to the [fiduciary] relationship," *id.* at 750 (emphasis added), refers to examples where the employer's mere acquisition of information independently gives rise to fiduciary obligations, such as when the fiduciary has "knowledge of

prejudicial acts by an employer—such as the failure of an employer to contribute to a fund as required," *id.*, or "when an ineligible person contributes to a fund" and the fiduciary knows or learns of the ineligibility, *id.* at 751. In contrast, an employer's arrival at the serious consideration stage does · not independently give rise to a fiduciary obligation to volunteer information in the absence of an inquiry.

Accordingly, in the absence of a promise to update an employee, an ERISA fiduciary's duty does not extend beyond giving complete and accurate answers to the employee's questions. A contrary rule would invite a process whereby employees would include boilerplate requests to be updated whenever they made an inquiry. Such a rule would force upon the employer a responsibility which it may be unwilling to assume and could, consequently, discourage employers from seriously considering otherwise beneficial plan changes.

*Bins* at 1053–1054

*Bins* would suggest that GM had no affirmative obligation to inform Plaintiffs of possible retirement incentives merely because those Plaintiffs filed retirement applications; no case has gone so far. Therefore, the Court finds that all Plaintiffs who, by their own admission, did not inquire about retirement incentives are dismissed.

■ Concerning the Plaintiffs who retired on or after January 1, 2000 and who claim to have contacted GM representatives prior to their retirement, the Court finds that these Plaintiffs must also be dismissed as they received no misinformation from GM. The majority of these Plaintiffs claim only to have spoken to their foremen. The facts indicate that Plaintiffs' foremen were not in a position to know whether GM was going to offer retirement incentives. *See* Defendant's Exhibit B. Furthermore, Plaintiffs' foremen did not inform Plaintiffs that retirement incentives were never going to be offered in the future, but rather that they had not heard anything new. In summary, the only Plaintiffs who retired on or after January 1, 2000 and claimed to have talked with GM representatives, were not misled. Accordingly, the Court finds that these Plaintiffs must also be dismissed.

## C. UAW L599 & UAW L659's Motion

■ Plaintiffs have also filed claims their local unions for breach of the duty of fair representation pursuant to the Labor Management Relations Act. 29 U.S.C. § 185. In order to prevail, Plaintiffs must demonstrate that UAW L599 and UAW L659 breached their duty of fair representation by engaging in "conduct toward a member of the collective bargaining unit [which is] arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). A union's action in representing its members can be said to be arbitrary only if, in light of the legal and factual landscape at the time of the union's actions, "the union's behavior is so far outside of a 'wide range of reasonableness' that is wholly irrational or arbitrary." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

■ Defendants correctly point out that it must be noted that the local union's duty to fairly represent its members is a different duty from the fiduciary duty a plan administrator owes plan participants under ERISA. *See* 29 U.S.C. § 1104. It is undisputed that the local unions are not ERISA plan administrators; therefore, the duty the local unions owe their mem-

bers is the duty of fair representation described above.

UAW L599 & UAW L659 present their arguments for summary judgment on two fronts. First, they claim that since the local unions had no knowledge of the negotiations occurring between the International Union and GM regarding the SAP, the local unions could not have breached any duty of representation owed to Plaintiffs. Secondly, the local unions argue that Plaintiffs failed to exhaust internal union and contractual remedies and should therefore be precluded from bringing this lawsuit.

### 1. Local Union's Knowledge

▇▇ Plaintiffs allege that the local unions did not inform them that GM would offer the SAP in February 2000. The local unions respond that it was the International Union, and not UAW L599 or UAW L659 that negotiated the February 2000 SAP. Defendants point out that it is well established that international unions and their local affiliates are distinct legal entities. *See, e.g. Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 218, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Moore v. Local Union 569 of the Int'l Bhd. of Elec. Workers*, 989 F.2d 1534, 1543 (9th Cir. 1993); *Lemons v. UAW*, 134 LRRM 2109, 1990 WL 114771 (E.D.Mich.1990) affirmed, 135 LRRM 3000, 1990 WL 175063 (6th Cir.1990).

Defendants therefore contend that if there was any duty to disclose the status of SAP negotiations to Plaintiffs, it was a duty owed by the International, and if the International breached that duty, then the local unions can not be held liable for that breach. *See id.* Defendants sum up this argument succinctly by stating that the local union "manifestly does not owe its members a duty of clairvoyance." Defendants Brief page 11.

The only evidence Plaintiffs provide to suggest that the local unions had any involvement with the SAP are efforts on the part of the local unions urging the International to negotiate incentives with GM. Local union Presidents McComb and McGee testified that they had absolutely no involvement in the negotiations between the International Union and GM. *See* McComb Deposition pages 8–9, 20–21; McGee Deposition pages 23, 33.

Given the strong indications that the local unions had no knowledge of the ongoing negotiations between the International Union and GM, and the fact that the local unions actively lobbied the International Union to pursue retirement incentives (thus fairly representing their members interests), the Court GRANTS UAW L599 and UAW L659's motions for summary judgment on the above grounds alone.

### 2. Plaintiffs' Failure to Exhaust Internal Union Appeals

▇▇ *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), held that union members have a duty to exhaust internal union remedies as a prerequisite to filing a lawsuit against their union. Plaintiffs admittedly did not exhaust such remedies. *Clayton* identified three circumstances which excuse a union member's duty to exhaust internal union procedures: (1) union hostility; (2) inadequate relief; and (3) unreasonable delay. *See Clayton* at 690, 101 S.Ct. 2088. Plaintiffs argue that all three elements are present in this case, and Defendants argue that none are.

As to the first element, union hostility, Plaintiffs' evidence of hostility is two articles written by Local 599 President McGee in the January and February, 2001 editions of *Headlight* (the local union's newspaper). In January 2001, McGee wrote

that this lawsuit was "frivolous" and said "When I have completed a list of the names of who is in this lawsuit, I will publish them in my article... I will also give the total amount spent on these lawsuits to date when I list the names of the members." *See* Plaintiffs' Exhibit AA and CC in the *Harrison* case. In February 2001, McGee wrote that the lawsuit was "merit less" and lamented that the Plaintiffs sued "sued rather than have their complaints resolved through the UAW Constitution and the UAW Public Review Board." *Id.* Defendant local unions point out that there is no evidence of any *pre-lawsuit* hostility between Plaintiffs and themselves, and indeed there is not. Accordingly, Plaintiffs are not able to claim that union hostility precluded them from filing internal union grievances.

Plaintiffs also claim that they should be excused from filing an internal union grievance since the grievance procedure would not provide them with the relief they seek. To support this claim, Plaintiffs argue that part of the SAP they feel they are entitled to is a $15,000 voucher for a new GM car. Plaintiffs contend that the local unions would not have been able to award them this, since only GM would have had the authority to do so. Defendants respond that the present lawsuit seeks nothing other than money damages, and that the union grievance procedure could certainly have afforded Plaintiffs that. The Court finds that Plaintiffs cannot avoid the union grievance procedure on the grounds that it would provide them with inadequate relief.

Finally, Plaintiffs argue that the internal process "would have wasted many months, if not years..." *See* Plaintiffs' brief p. 22. Defendants point out that many courts have found that the UAW internal procedure is governed by a series of reasonable time limits. *See Monroe v. International Union, UAW*, 540 F.Supp. 249 (S.D.Ohio 1982). Additionally, the Sixth Circuit requires "a clear and positive showing that pursuit of grievance and intra-union appeal procedures would be futile before allowing access to federal courts on Section 301 claims." *Cotter v. DaimlerChrysler*, 87 F.Supp.2d 746, 753 (E.D.Mich.2000). Therefore, Plaintiffs can not avoid the union grievance procedure on these grounds either.

In sum, based on undisputed facts, Plaintiffs have no excuse for their failure to exhaust internal union procedures. Thus, the Court GRANTS Defendant UAW L599 and UAW L659 motions for summary judgment on these grounds as well.

### III. Conclusion

For the reasons set forth above, Defendant General Motors motion for summary judgment is GRANTED and Defendants UAW L599 & UAW L659 motion for summary judgment is GRANTED.